RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0227P (6th Cir.)
File Name: 01a0227p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

HAROLD F. BRAITHWAITE,
  *Plaintiff-Appellant,*

    No. 99-3188

  *v.*

THE TIMKEN COMPANY, et al.,
  *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 97-02258—James D. Thomas, Magistrate Judge.

Argued: June 12, 2001

Decided and Filed: July 18, 2001

Before: JONES, SUHRHEINRICH, and DAUGHTREY,
Circuit Judges.

_____

## COUNSEL

**ARGUED:** Allen G. Carter, Sr., Canton, Ohio, for
Appellant. J. Sean Keenan, DAY, KETTERER, RALEY,
WRIGHT & RYBOLT, LTD., Canton, Ohio, for Appellees.

1

**ON BRIEF:** Allen G. Carter, Sr., Canton, Ohio, for Appellant. J. Sean Keenan, Robert J. McBride, DAY, KETTERER, RALEY, WRIGHT & RYBOLT, LTD., Canton, Ohio, for Appellees.

_____

## OPINION

_____

NATHANIEL R. JONES, Circuit Judge. On September 4, 1997, plaintiff-appellant, Harold F. Braithwaite ("plaintiff" or "Braithwaite"), filed a complaint against his employer, The Timken Company ("Timken"), and several of its employees. Braithwaite alleged that defendants, by their actions which resulted in the termination of his employment, violated the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), the Civil Rights Act of 1991 and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1985(a), and 1988. Braithwaite also alleged that some of his fellow employees defamed him. On January 15, 1999, United States Magistrate Judge James Thomas granted defendants' motion for summary judgment on all of the plaintiff's claims. For the reasons stated below, we **AFFIRM** the Magistrate Judge's decision.

### I. FACTS

In January 1989, Timken hired Harold Braithwaite, an African-American male, to work in the Company's Gambrinus Roller Plant as a cell processor. As a cell processor, Braithwaite was responsible for grinding rollers, which are component parts of the company's principal product, roller bearings.

At the time when Braithwaite was hired, he was given a Company Hourly Associate Handbook. At a later date, he received an updated handbook as well. One section of the handbook is devoted to workplace rules. The rules are organized in three separate categories, which reflect the importance of the rule. Category I contains the most serious violations including striking or manhandling another person

*See Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999). There is no dispute that a violation of Rule 8 is substantially more serious than a violation of Rule 16 and that discharge is an appropriate punishment for a Rule 8 violation.

### IV. CONCLUSION

For the reasons stated above, we **AFFIRM** the Magistrate Judge's decision.

making a written statement or that they were biased against him. Furthermore, as the defendants point out, Braithwaite was subsequently given several opportunities to present his version of the facts. As noted above, plaintiff took full advantage of a four-step grievance process and eventually brought his claim before an arbitrator who heard testimony from several witnesses including Braithwaite. Like Timken, the arbitrator concluded that Braithwaite shoved Dowdell.

In conclusion, we find that the plaintiff's allegations do not present any material evidence that Timken did not make a "reasonably informed and considered decision" and did not "honestly believe" that Braithwaite shoved Dowdell when they fired him.

## C. Evidence that Other Employees were not Discharged for Similar Conduct

Alternatively, plaintiff contends that his claim is supported by evidence that he was treated differently from other employees who were fired even though they engaged in the same type of conduct that led to his termination. It is well-established that a plaintiff may demonstrate pretext by producing "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. However, in this case, the plaintiff has not provided any evidence that another employee was not discharged for committing a similar offense.

In various motions, Braithwaite alleges that Kenny Edwards, James Perry, and Jonathan Stitt were only suspended for five days without pay for threatening others in violation of Rule 16. These employees, who were only accused of violating rule 16, are obviously not "similarly situated" to Braithwaite, who was accused of violating Rule 16 *and* Rule 8. Accordingly, the fact that these other employees were not terminated, does not tend to show that Timken discriminated against Braithwaite by terminating him.

(Rule 8), and theft or destruction of company property (Rules 10, 11). According to the handbook, employees who violate Category I rules will be discharged without warning. In comparison, Category II describes less serious violations such as threatening or coercing another person (Rule 16) and sleeping on company time (Rule 17). Accordingly, violators of Category II rules are subjected to discipline ranging from time off to discharge depending on the nature of the act.

On November 8, 1995, plaintiff was working the afternoon shift on a production line in Cell B. According to Braithwaite, the afternoon shift typically runs from 3:00 p.m. until 11:00 p.m., however, on that day, his co-worker, Roy Dowdell, left the line early and stopped the production flow of the roller bearings at approximately 10:00 p.m. Braithwaite told Dowdell that he and his other co-workers did not want to end the shift early because they were concerned that if they did, they would not receive a wage incentive because of lack of production. Braithwaite informed Dowdell that he was going to report to management that he left the production line early.

Plaintiff claims that Dowdell became very angry and repeatedly shouted in a loud voice, "you are not going to management with this." According to Braithwaite, Dowdell moved towards him and threatened to strike him. Braithwaite acknowledges that he told Dowdell that "after work, your butt is mine," and alleges that Dowdell replied "we can take care of it right here." J.A. at 421. However, he maintains that no physical fighting took place that evening and that he had no intention of engaging in a fight with Dowdell at the close of their shift. *Id.*

In contrast, Dowdell and some other employees offer a very different version of the confrontation. Dowdell contends that when Braithwaite accused him of shutting down the line, he approached him to explain that he had not shut down the line. In response, Braithwaite threatened him several times saying "after work, your butt is mine," and "I'm going to kick your fucking ass." According to Dowdell and others,

Braithwaite shoved Dowdell several times during the argument, before other workers stepped in and separated them. J.A. at 111-113, 137, 141, 193, 446.

After this incident, Dowdell went to see his supervisor, Steve Tornero, to explain what had happened on the line in Cell B. Shortly thereafter, Braithwaite arrived at the supervisor's office and the two began arguing again. When another supervisor, Lester Knight, ordered Braithwaite to quiet down, Braithwaite allegedly pointed at Dowdell and said, "you've had it at 11:00 p.m." J.A. at 179, 190. Braithwaite then left the office. Because of Braithwaite's threats, Dowdell requested and was permitted to work the first four hours of the next shift in order to avoid a further confrontation with Braithwaite. Later that night, Tornero saw Dowdell and asked him if everything was okay. At that point, Dowdell told his supervisor that Braithwaite had shoved him while they were arguing on the plant floor.

The next day, November 9, 1995, Tonero reported the incident to his supervisor Randy Toney. Toney instructed Tonero to obtain witness statements from employees who worked in Department 74 as to what took place the previous evening. Tonero asked employees to provide written statements concerning what happened between the plaintiff and Mr. Dowdell. Tonero received statements from Braithwaite, Dowdell and three other hourly associates, Dave Keenan, Jeremy McCartney, and Lamar Talley.

Braithwaite's statement focused on the shutting down of Cell B, but made no mention of the incident between himself and Dowdell. J.A. at 90-91. In contrast, Dowdell's statement outlined the argument between himself and Braithwaite in detail and alleged that Braithwaite had shoved him a number of times. J.A. at 111-114. Dowdell's statement was supported by both Keenan and McCartney who stated that Braithwaite shoved Dowdell several times during the argument. J.A. at 137, 141. Lamar Talley's statement confirmed that Braithwaite and Dowdell had exchanged

himself and Dowdell. According to Braithwaite, Tornero requested that he "write a statement regarding the stoppage of production flow that occurred on November 8, 1995." However, he contends that "[n]o supervisor or any member of management requested that [he] write a statement regarding the verbal incident which occurred between [himself] and Mr. Dowdell on November 8, 1995." Pl. Br. at 15. Braithwaite's claim that he did not know that he was expected to submit a written statement concerning the incident is supported by the fact that the statement that he submitted shortly after the incident did not contain any reference to the altercation between himself and Dowdell.

However, although it may be true that no supervisor approached Mr. Braithwaite individually and asked him to submit a statement regarding the incident between himself and Dowdell, there is no dispute that Braithwaite was aware that management was soliciting statements regarding the incident and that he had an opportunity to give his version of the events. In fact, paragraph 35 of the plaintiff's own complaint states that,

> On November 9, 1995, Mr. Tornero spoke to the employees he supervised and asked who made the decision to shut down the Cell. Mr. Tornero was advised that Mr. Dowdell left the production line before 11:00 p.m. Mr. Tornero asked the employees to provide written statements of whether they witnessed the incident on November 8, 1995 between plaintiff and Mr. Dowdell.

J.A. at 14-15.

Thus, it is clear that Braithwaite was given an opportunity to make a written statement.

Although there may have been some miscommunication and it is possible that plaintiff believed that it was only necessary for him to make a statement regarding the stoppage of the production flow, this possibility does not demonstrate that the management tried to prevent Braithwaite from

clearly stated that Harold Braithwaite had shoved Roy Dowdell several times. In addition, supervisors Lester Knight and Steve Tornero stated that Braithwaite threatened Dowdell shortly after the incident occurred, pointing his finger at him and saying "you've had it at 11:00 P.M." J.A. at 189, 190.

### 2. Management Discouraged Other Employees from Making Statements

Plaintiff Braithwaite also alleges that the management displayed its bias against him when they discouraged employee Kenneth Hill from making a statement which favored him. This evidence is very weak. On August 5, 1995, Kenneth Hill gave a deposition in which he testified that he offered to give a statement, but that he did not because Steve Tonero told him that his statement "would not be necessary." However, later in the same deposition, Kenneth Hill retracted this testimony. When asked whether Tornero told him that he didn't need his statement, Hill responded, "Or maybe I thought I really don't need to do it. Maybe he didn't say it outright." J.A. at 502. Thus, the evidence that Tornero discouraged Hill from making a statement is tenuous at best.

Furthermore, assuming *arguendo* that Steve Tornero did discourage Kenneth Hill from making a statement, this fact does not demonstrate bias since there is no evidence that Steve Tornero knew who Kenneth Hill's statement would support. In his deposition, Hill stated that Tornero would not have had any way of knowing that he was going to tell him that he did not see any "physical contact made." J.A. at 494-495. Accordingly, this evidence is not sufficient to allow a rational jury to find that management did not "honestly believe" that Braithwaite shoved Dowdell and to infer that the true motivation for his termination was racial animus.

### 3. Management Did Not Allow Braithwaite To Make a Statement

In addition, plaintiff contends that management demonstrated racial bias by failing to ask him to make a statement regarding the altercation that took place between

words, but did not mention any pushing or shoving.[1] Supervisors Tonero and Knight stated that they did not see the incident, but that they heard Braithwaite threaten Dowdell in the supervisor's office after the incident. J.A. at 189-190.

Tornero passed the information that he had collected to Toney. Superintendent of Labor Relations, Debra J. Rankine, reviewed the information. Shortly thereafter, Department 74 Operations Management determined, with approval of the Industrial Relations Department, that Braithwaite had violated Rule 8 (striking another person) and Rule 16 (threatening another person) of the Company's Rules of Conduct and that he should be discharged. On November 10, 1995, Supervisor Tonero met with Braithwaite and a union steward. Braithwaite was informed that his employment was being terminated immediately for violation of Rule 8 and Rule 16.

As a member of the United Steel Worker's Union, Braithwaite filed a grievance and utilized the entire grievance procedure, which concluded with a binding arbitration on February 16, 1996. In a day long arbitration hearing, Timken presented four witnesses and the union presented two witnesses including Braithwaite. The Arbitrator found that:

Although the grievant testified that on the November 8 date he was not involved in pushing, shoving or "anything of that nature," the evidence presented by the Company indicates otherwise. Testimony of the Company's supervisory personnel indicates that the investigation conducted by the Company was in no way different than any other investigation that they may have conducted as a result of receiving allegations of a similar nature.

---

[1] Talley stated: "I saw Harold and Roy arguing about something. So it got louder and both men were getting hot or upset. So before someone got hurt I got between them and tryed (sic) to cool Harold down. Harold said after work your but (sic.) is mine and Roy said we can take care of it right here." J.A. at 193.

J.A. at 100-101.

In September 1997, Braithwaite filed suit in federal court alleging that he was terminated from his employment on account of his race, that he was treated differently than white employees, and that he was defamed by defendants. Specifically, plaintiff alleged that Timken and its supervisory and management employees, Steven B. Tornero, Randy Toney, Lester Knight, and Debra J. Rankine violated the Civil Rights Act of 1964, 42 U.S.C. § 2000e, the Civil Rights Act of 1991 and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1985(a) and 1988. Plaintiff also alleged that hourly employees Roy Dowdell, Jeremy McCartney, and Dave Keenan conspired against him and defamed him in his name and reputation. Pursuant to 28 U.S.C. § 636(c), both parties consented to have their case handled by a United States Magistrate Judge.

On January 14, 1999, Magistrate Judge Thomas granted the defendants' motion for summary judgment. The Magistrate found that the plaintiff did not offer sufficient evidence to allow a reasonable finder of fact to conclude that the defendants fired him on account of his race in violation of the Civil Rights Acts. In addition, he also held that plaintiff's defamation claim was collaterally barred by the arbitrator's finding that the plaintiff had in fact manhandled Mr. Dowdell. On appeal, plaintiff challenges the dismissal of his Civil Right claims.

## II. STANDARD OF REVIEW

This court exercises *de novo* review over the Magistrate Judge's grant of summary judgment. *See Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 178 (6th Cir. 1996). When reviewing the record, all inferences shall be drawn in the light most favorable to the non-moving party. *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245-46 (6th Cir. 1997). However, an opponent of a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,*

Braithwaite shoved Roy Dowdell at the time when they fired him.

Furthermore, although several employees later testified that they did not see Braithwaite shove Roy Dowdell, most of these employees did not contradict the management's finding that Braithwaite shoved Dowdell since they also testified that they did not see the entire incident. For example, although Kenneth Hill testified that he did not see Braithwaite push Dowdell on November 8, 1995, he also stated that he was "kind of far away from the incident" and "didn't see most of it." J.A. at 499. Later, when the union asked him if there was anything he could contribute to the arbitration of this dispute, Hill responded that he "couldn't really" contribute, because he "hadn't seen that much." J.A. at 502. In addition, while Patrick Weaver and Collins Brost stated that they had not seen Braithwaite shove Dowdell, their testimony also suggests that they only saw the "tail end" of the incident. Weaver stated that he heard "a commotion." However, by the time he looked up, "Mr. Keenan had ahold of Mr. Dowdell, and Lamar [Talley] had ahold of Harold [Braithwaite]. J.A. at 694. Similarly, Collins Brost indicated that he was not in the A cell area when the "commotion" began. J.A. at 452.

The only individual (aside from Braithwaite) who appears to have seen the entire incident and gave testimony that Mr. Braithwaite did not shove Mr. Dowdell is Lamar Talley.[4] Although Talley's testimony does create a genuine issue as to whether Mr. Braithwaite actually shoved Roy Dowdell, this testimony is not sufficient to allow a rational juror to find that management ignored statements that proved Braithwaite's innocence and that the decision to fire Braithwaite was not based on a reasonable belief. Management had good reason to doubt the veracity of Talley's testimony. As noted above, Talley's testimony was contradicted by three witnesses who

---

[4] As noted above, Talley's initial written statement did not confirm or deny that Braithwaite had shoved Dowdell. However, at a deposition taken after Braithwaite's termination, Talley was asked if he saw either of "the gentlemen strike an other," and he responded, "No." J.A. at 570.

statements that Harold Braithwaite shoved Roy Dowdell several times on November 8, 1995. Based on these statements, Timken avers that it determined that Braithwaite shoved Dowdell and that he should be terminated pursuant to Rule 8, which prohibits an employee from "striking or manhandling another person." J.A. at 86. Plaintiff Braithwaite alleges that when management made its decision to fire him for shoving Roy Dowdell, they intentionally ignored several employee statements that supported his claim that he never touched Roy Dowdell. However, Braithwaite's claim is not supported by the record.

The first problem with Braithwaite's allegation that management ignored employee statements is that none of the statements that he cites were available when Timken made its decision to fire him. The record indicates that on November 9, 1995, the day after the incident, management asked employees to provide statements concerning the altercation between Braithwaite and Dowdell. Only seven statements were made. Dowdell, Keenan, and McCartney all alleged that Braithwaite shoved Dowdell several times. Braithwaite made a brief statement which asserted that Dowdell left his post and caused the line to be shut down, but did not discuss the altercation. Lamar Talley stated "I saw Harold and Roy arguing about something. So it got louder and both men were getting hot or upset. So before someone got hurt I got between them and tryed (sic.) to cool Harold down." J.A. at 193. Lester Knight and Steve Tornero stated that they did not see the incident but that later that night they did see Braithwaite point his finger at Dowdell and say "You've had it at 11:00 p.m." J.A. at 122-123. While three of these statements clearly accuse the plaintiff of shoving Mr. Dowdell, none of the statements actually refute the allegations against Braithwaite.[3] On the basis of these statements, there is no doubt that Timken had a reasonable belief that Harold

---

[3] Although it is true that Lamar Talley's statement does not mention any shoving, his statement does not dispute that Braithwaite shoved Dowdell.

*Inc.*, 477 U.S. 242, 248 (1986); *see also Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 256 (6th Cir. 1998). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.  DISCUSSION

#### A.  Background

As a plaintiff claiming employment discrimination under the Civil Rights Acts, Braithwaite bears the initial burden of establishing a *prima facie* case of discrimination. He can meet this burden by providing direct or circumstantial evidence that raises a genuine issue that his employer discriminated against him or by simply proving that (1) he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him. *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). In this case, defendants assume, for the purposes of argument, that plaintiff has established a *prima facie* case with regard to the November 1995 incident.

Once plaintiff establishes a *prima facie* case, the employer is faced with a "burden of articulation" and must set forth "some legitimate non-discriminatory reason for the employee's discharge." *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir. 1994); *see also Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1024 (6th Cir. 1993). In the instant case, The Timken Company has met this burden by asserting that plaintiff was discharged because he violated Rule 8 by manhandling coworker Dowdell.

Thus, the burden shifts back to Braithwaite, who must demonstrate that the defendants' explanation for his firing is a pretext for discrimination. *See St. Mary's Honor Center v.*

*Hicks,* 509 U.S. 502, 507 (1993) ("[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times on the plaintiff.") (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8 (1981)). In order to do so, plaintiff must produce sufficient evidence from which the jury could "reasonably reject [the defendants'] explanation" and infer that the defendants "intentionally discriminated" against him. *See Woythal,* 112 F.3d at 246-47 (citing *St. Mary's Honor Center,* 509 U.S. at 519).[2] Accordingly, the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not "honestly believe" in the proffered non-discriminatory reason for its adverse employment action. *See Smith v. Chrysler,* 155 F.3d 799, 806-07 (6th Cir. 1998) (citing *Fischbach v. District of Columbia Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[I]f the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so.")).

In order to determine whether the defendant had an "honest belief" in the proffered basis for the adverse employment action, this Court looks to whether the employer can establish its "reasonable reliance" on the particularized facts that were before it at the time the decision was made. *See Smith,* 155 F.3d at 807. In *Smith v. Chrysler*, this Court provided some guidance in determining whether reasonable reliance was present. We stated:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry

---

[2]The Supreme Court recently held that "[a] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 148 (2000).

is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

*Id.*

If there is no material dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.

## B. Braithwaite's Evidence of Pretext

On appeal, plaintiff Braithwaite argues that the district court erred in granting summary judgment. He contends that he put forth sufficient evidence to allow a rational jury to reject the defendants' assertion that they fired him because he shoved Roy Dowdell and to infer that his termination was motivated by racism. Specifically, Braithwaite alleges that the racism underlying the company's decision is evident in the inadequate and biased investigation of the allegations against him. Braithwaite contends that management (1) ignored statements that proved that he did not shove Roy Dowdell; (2) discouraged other employees from giving statements that supported him; and (3) did not allow him to give his version of the altercation between himself and Roy Dowdell. He contends that his employers decision to fire him on the basis of such an inadequate investigation demonstrates that the proffered reason for his termination (shoving Roy Dowdell) was not "honestly held" and that the decision to fire him must have been based on racism. However, Braithwaite has not put forth any material evidence to support these allegations.

### 1. Management Ignored Employee Statements

After the altercation between Braithwaite and Dowdell, management obtained statements from several of the employees who witnessed the incident. It is undisputed that Roy Dowdell, Dave Keenan, and Jeremy McCartney all gave