NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0737n.06

No. 15-1101

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CICELY MABEN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | **FILED** |
| v. | ) | Nov 04, 2015 |
| | ) | DEBORAH S. HUNT, Clerk |
| SOUTHWESTERN MEDICAL CLINIC, | ) | ON APPEAL FROM THE UNITED |
| LAKELAND REGIONAL HEALTH | ) | STATES DISTRICT COURT FOR THE |
| SYSTEM, and LAKELAND MEDICAL | ) | WESTERN DISTRICT OF MICHIGAN |
| PRACTICES, | ) | |
| | ) | |
| Defendants-Appellees. | | |

BEFORE:     COLE, Chief Judge; DAUGHTREY and DONALD, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Plaintiff Cicely Maben, an African-American woman, was terminated from her job as a phlebotomist with defendant Southwestern Medical Clinic, P.C. Asserting that the adverse employment action was race-based, Maben brought claims against Southwestern and co-defendants Lakeland Regional Health System and Lakeland Medical Practices—Southwestern's parent corporations—under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e-17, and under 42 U.S.C. § 1981.[1] Following a period of discovery, the defendants filed a motion for summary judgment in their

---

[1] Maben's complaint also purports to raise a claim of discrimination under Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101–2804. Although the plaintiff's appellate brief makes no specific argument relating to her state-law claim, any oversight in this regard may be excused because this court reviews claims under the Michigan scheme using the same standards as it does for claims of racial discrimination brought under Title VII. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)

favor that the district court granted. Maben now appeals, arguing that the district court erred

when it: (1) disregarded as hearsay an offensive comment allegedly made by Maben's

supervisor; (2) applied the "honest belief rule" to reject evidence of pretext; and (3) rejected

Maben's contention that certain Southwestern employees outside the protected class were treated

more favorably than was the plaintiff. For the reasons set out below, we affirm the district

court's grant of summary judgment to the defendants.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In addressing the defendants' motion for summary judgment in a written decision, the

district court expertly and concisely presented the legal positions of the parties and the relevant

evidence offered in support of, and in opposition to, that motion. The district judge summarized

the pertinent information as follows:

> Plaintiff, Cicely Maben, worked as a phlebotomist for Defendant Southwestern Medical Clinic, P.C. (Southwestern) until she was terminated in April 2012. Plaintiff, who is African-American, argues that Southwestern terminated her based on her race, and that its asserted reasons are mere pretext. Southwestern contends that it terminated Maben based on a series of disciplinary problems . . . .

> Prior to her termination, Maben worked in Southwestern's Stevensville facility. Maben's duties included drawing blood from patients and preparing blood specimens in vials for testing. Marilyn Hurrle, the facility's manager, supervised Maben.

> Southwestern utilizes a "progressive" discipline policy, that includes the following steps: (1) verbal counseling, (2) a written warning, (3) written warning with suspension, and (4) separation of employment. The policy makes clear that the steps are only a guideline, and that a manager may deviate from the steps.

> During 2009 and 2010, Southwestern's management reprimanded Maben for issues with punctuality, and eventually issued a performance improvement plan. After receiving the plan, Maben did not have any problem for over a year.

> In late 2011, however, Maben began to have issues related to punctuality, attendance, interactions with co-workers, professionalism, and adherence to lab protocols. In early 2012, Hurrle issued Maben a performance evaluation noting that Maben was consistently late for work, needed to be more respectful toward

her co-workers, and needed to work on upholding Southwestern's standards for attitude, confidentiality, compassion, and effective communication. Shortly thereafter, Maben's co-workers, Jodi Hobson and Mellany Gardiner, told Hurrle that Maben had told Hobson to "get out of my face," and that Maben had told Gardiner that "Mexicans are so fucking slow." In response, Hurrle suspended Maben for the remainder of the day and issued a third-step written warning. On March 28, 2012, Maben left work early after receiving a phone call from her son's school, and later provided Hurrle with a note from the school stating that her son had left school early without permission. Hurrle testified that Maben originally told Hobson that she had forgotten that her son had a half day of school, and she then told Hurrle that her son was with a friend and had not gone to school. On April 10, 2012, Maben failed to follow lab protocol in labeling blood specimens, with the result that two patients' blood samples were mixed up and the patients had to have their blood re-drawn.

On April 20, 2012, Hurrle terminated Maben's employment, citing "inappropriate comments made to co-workers," Maben's "inability to finalize the reason" that her son was home from school early, and failure to follow lab protocol in marking specimens.

Approximately six months after her dismissal from Southwestern, Maben filed a charge of discrimination with the Michigan Department of Civil Rights and the Equal Employment Opportunity Commission (EEOC). In that filing, she alleged race discrimination based upon the fact that she "was denied bereavement benefits that similarly situated white co-workers were given," that she was "told that [she] could no longer park in the same parking lot as [her] white co-workers did," and that "similarly situated co-workers of another race . . . were treated more favorably under the same or similar situation[s] . . . ." The EEOC, however, found the charges to be baseless, dismissed them, and notified Maben of her right to sue her former employer in state or federal court. The plaintiff exercised that right in a timely manner, claiming broadly in her federal-court complaint that she was subjected to more severe discipline by the defendants than were Caucasian employees of Southwestern.

The district court ultimately granted the defendants' motion for summary judgment. In doing so, the court concluded that a racially derogatory statement allegedly made by Hurrle to

Lisa Doolen, one of Maben's co-workers, was inadmissible hearsay and thus could not be used by the plaintiff to establish that she had been the victim of racial discrimination. The district court also determined that the defendants honestly believed that they were relying upon reasoned, nondiscriminatory rationales in terminating Maben's employment, and that Maben could not establish that the company's stated reasons were a pretext for invidious discrimination because the plaintiff could not point to another similarly situated employee who was treated more leniently than she was.

Maben now appeals from that ruling. In this court, she focuses upon the same three issues discussed by the district court in its opinion.

## II. DISCUSSION

### A. Standard of Review

As in any appeal from a grant of summary judgment, we review the district court's ruling *de novo*. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

### B. Framework for Analysis Under Federal Anti-Discrimination Statutes

Maben purports to raise claims under the anti-discrimination provisions of both Title VII and 42 U.S.C. § 1981. In pertinent part, Title VII makes it unlawful for an employer "to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Similarly, 42 U.S.C. § 1981 guarantees to all persons "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Given the similarity of the protections offered by the two statutory provisions, Title VII analysis also provides the framework for reviewing discrimination claims brought pursuant to § 1981. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009).

### 1. Direct Evidence of Discrimination

Title VII claims of racial discrimination may be proven either by direct evidence or by circumstantial evidence. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003) (citation omitted). "In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Moreover, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against the protected group." *Johnson*, 319 F.3d at 865. For example, "a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Maben intimates that a comment allegedly made by Marilyn Hurrle, the person responsible for the plaintiff's termination, could constitute direct evidence of racial discrimination. That comment, that Maben and another employee were "two black inappropriate ladies," was not heard by Maben herself, but rather allegedly was related to Maben by Lisa

Doolen, who also worked at Southwestern as a phlebotomist. The defendants insist that the alleged statement is inadmissible hearsay and thus cannot be considered in deciding a summary judgment motion. *See, e.g.*, *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003). Regardless of the merits of the evidentiary issue, the statement allegedly made by Hurrle is too ambiguous to satisfy the plaintiff's burden of proof. Even if Hurrle made the statement at issue, nothing in that reference "requires" a conclusion that the subsequent termination of the plaintiff was based upon invidious racial discrimination.

## 2. Circumstantial Evidence of Discrimination

Absent direct evidence of discrimination, the plaintiff still may defeat a motion for summary judgment by relying on circumstantial evidence showing the defendants' improper animus. To do so, the plaintiff must utilize the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under that paradigm, the plaintiff first must establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53 (citing *McDonnell Douglas*, 411 U.S. at 802). If she does so, the burden of production shifts to the defendants to "articulate some legitimate, nondiscriminatory reason for the [alleged adverse action.]" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Maben then is required to prove that the reasons proffered by the defendants were not their true motivations for their actions, but were mere pretexts for prohibited discrimination. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). We have held consistently that a plaintiff's burden of establishing a *prima facie* case is not an onerous one, *see, e.g.*, *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (citing *Burdine*, 450 U.S. at 253), and is "a burden easily met." *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) (citations omitted).

### a. *Prima Facie* Case

In this case, the defendants tacitly concede that Maben has met her *prima facie*-case burden. In fact, rather than contest the plaintiff's ability to establish the elements of the *prima facie* case, they simply offer their legitimate, nondiscriminatory reasons for the employment action and then argue that the plaintiff failed to adduce evidence that would show that those reasons were mere pretexts to disguise discriminatory motives.

### b. Articulation of Legitimate, Non-Discriminatory Reasons

The reasons offered by the defendants for terminating Maben are indeed legitimate and nondiscriminatory in nature. According to the discharge notice provided to the plaintiff, Hurrle noted as bases for the employment action "an incident with inappropriate comments made to coworkers, an inability to finalize the reason [Maben's] son [was] home unattended from school and which school he attends, [and] not following lab protocol to adequately mark a blood specimen creating an incident report need and putting two patients at risk."

### c. Pretext

Once the defendants met their burden of articulating legitimate reasons for the termination of the plaintiff's employment, the burden of production shifted to Maben to establish that those reasons were pretextual. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). The plaintiff's attempts to prove pretext invoke each of the three avenues described in *Dews* for making such a showing.

First, Maben argues, in effect, that the defendants' reliance upon the plaintiff's inappropriate comments and her inconsistent explanations for her absence from work must be

considered pretextual because those rationales had no basis in fact. According to Maben, she never told Jodi Hobson to "get out of my face," and never said to Mellany Gardiner that "Mexicans are so fucking slow." Moreover, the plaintiff insists that she never offered inconsistent reasons for her need to leave work to care for her son.

Although much time and effort has been expended during discovery in this litigation in an effort to prove or disprove the allegations made against Maben, ultimately, whether the plaintiff actually made the offensive comments or whether she offered three different explanations for her early departure from work is irrelevant. As noted in *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001):

> This court has adopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied "on the particularized facts that were before it at the time the decision was made."

(Citations omitted.) Here, the defendants did indeed rely on particularized facts before the decision-makers at the time the termination decision was made.

For example, Jodi Hobson described in a detailed e-mail message to Hurrle the circumstances surrounding Maben's alleged vituperative and racist remarks. In that e-mail, Hobson noted the "get out of my face" comment and also reported what Gardiner claimed the plaintiff had said to her about Mexicans. Hobson noted that when Gardiner came to her to relate Maben's racist comment, Gardiner was "very red in the face and was visibly shaken." Additionally, when Gardiner herself went to Hurrle with her complaint, Hurrle described Gardiner as "visibly upset." Such information is sufficiently particularized and serious to support Hurrle's reliance upon it in forming an honest belief that Maben indeed had made the

obnoxious comments. Thus, even though Maben disputed the validity of the charges made by Hobson and Gardiner, the honest belief rule insulates the defendants from a finding that their reliance upon this particular rationale as a ground for terminating Maben is pretextual.[2]

Similarly, Hurrle had sufficient, particularized information before her to support her honest belief that Maben offered suspiciously inconsistent explanations for her need to leave work before her scheduled departure time in order to care for her son. Even ignoring the third account that Maben allegedly gave to Hurrle alone—the account that the plaintiff's son had not been at school at all on the day in question—evidence indicated that at least one of the plaintiff's accounts of what precipitated her absence was fabricated.[3] Jodi Hobson noted that Maben had come to her and explained "that her son is sitting outside her house because he had a half day and she didn't know it. She said that he called her and said that he peed outside but now he has to 'booboo' poop." A letter from an administrative assistant for the Benton Harbor Area Schools indicates, however, that it was not Maben's son who called her, but rather the school itself to inform Maben that her son "had left school without permission and was to have been headed home." In light of Maben's ongoing attendance and punctuality problems, Hurrle honestly and reasonably could believe that the plaintiff was fabricating explanations to cover her absence from her job.[4]

Maben also claims that the reasons stated by the defendants for terminating her employment were not the actual motivations for the decision. To support that assertion, Maben contends that Hurrle was driven to fire her by the manager's racially discriminatory attitudes.

---

[2] Although not before Hurrle at the time of her termination decision, and thus not relevant to the honest-belief-rule analysis, deposition testimony by Gardiner indicated that Maben eventually acknowledged making the racist comment and apologized to Gardiner for making it.

[3] Maben argues that the account referenced only by Hurrle should not be given credence, both because Maben never offered that explanation and because Hurrle "cannot honestly believe her own lie."

[4] On another occasion, Maben failed to show up at work after promising the night before to do so. Instead, the plaintiff called to say she had overslept, although she actually had visited her sister to have her hair curled.

Maben did admit in her deposition testimony that it was Hurrle who had hired her at Southwestern, and that Hurrle had never made comments in Maben's presence that indicated that Hurrle was racially biased or prejudiced. Nevertheless, the plaintiff argues that Lisa Doolen's assertion that Hurrle once referred to Maben and a friend as "two black inappropriate ladies" indicates that there was indeed a racial component to the termination decision.

The district judge did not consider the alleged comment in ruling on the defendants' motion for summary judgment, concluding that the statement constituted inadmissible hearsay after noting that Hurrle had denied making the statement, and that Doolen had no recollection either of ever hearing Hurrle make the comment or of relating the substance of the supposed comment to Maben. The plaintiff insists, however, that the statement should have been considered admissible, either as evidence of Hurrle's state of mind under Federal Rule of Evidence 803(3), or as nonhearsay pursuant to the provisions of Federal Rule of Evidence 801(d)(2)(A) or (D).

Acceptance of Maben's argument that the alleged statement by Hurrle is admissible in evidence to challenge the legitimacy of the defendants' stated rationales for firing her requires a court to rely upon testimony by Maben that Doolen said that Hurrle said something particularly offensive. Consequently, before evaluating whether Hurrle's alleged comment constitutes "[a] statement of the declarant's then-existing state of mind," Fed. R. Evid. 803(3), we first must determine whether Maben's testimony regarding an out-of-court statement by *Doolen* qualifies as a hearsay exception or can be considered nonhearsay. In an effort to satisfy that burden, the plaintiff directs the court to the alternative provisions of Federal Rule of Evidence 801(d)(2)(A) and (D).

Those subsections of the rule recognize that a person's statement will not be considered hearsay if the statement is offered against an opposing party and if it either "was made by the party in an individual or representative capacity," Fed. R. Evid. 801(d)(2)(A), or "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). Unfortunately for Maben, neither of those options can be invoked to justify the admissibility of Doolen's statement. Because Doolen is not a party to this litigation, reference to subsection (A) is inapposite. Furthermore, even presuming that Doolen did make the alleged statement to the plaintiff, when she did so, Doolen had no input into company personnel decisions and clearly was not acting within the scope of her authority as a phlebotomist at Southwestern. *Cf. Carter*, 349 F.3d at 276 (comments made to Carter by vice-provost that dean of college "was trying to get rid of the black professors" were within the scope of the vice-provost's job to oversee the university's affirmative action programs); *Johnson*, 319 F.3d at 868 ("statements of managerial-level employees who have the ability to influence a personnel decision are relevant"). Because Maben cannot establish that the alleged statement upon which she relies to establish the pretextual nature of the defendants' rationales for termination was not hearsay or admissible as an exception to the hearsay rule, the district court did not err in disregarding the statement when ruling upon the defendants' motion for summary judgment.

Finally, Maben contends that the rationales for termination offered by the defendants were insufficient to warrant the challenged conduct because other similarly situated employees at Southwestern who were outside the protected class were not terminated despite committing some of the same infractions that the plaintiff did. In formulating that argument, the plaintiff also

complains that the district court applied too strict a standard when discussing whether other employees and their actions could be compared to those of the plaintiff.

In her appellate brief, Maben takes issue with the district court's citation to *Braithwaite v. Timken Co.*, 258 F.3d 488 (6th Cir. 2001), and with its assertion that, in order to establish pretext by comparator evidence, a plaintiff must demonstrate that employees outside the protected class "were not fired even though they engaged in *substantially identical* conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* at 497 (emphasis added). She argues that a requirement that a plaintiff prove "substantial identity" is not only logically flawed—because there can be no degrees of "identical" conduct—but also at odds with Supreme Court and Sixth Circuit precedent that requires that the conduct of other employees be only of "comparable seriousness" to the conduct leading to the plaintiff's discharge from employment. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

Although the district court did quote the language from *Braithwaite* to which the plaintiff objects, the court also explained exactly how comparator status can be achieved by quotation of and citation to cases that incorporate the view of the concept of "similarly situated" that Maben urges. Specifically, the district court noted that a plaintiff seeking to prove pretext by showing that different employees were treated less severely than the plaintiff "need not demonstrate an exact correlation . . . rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks and citation omitted). Stated differently, "to be found similarly situated, the plaintiff and his [or her]

proposed comparator must have engaged in acts of '*comparable seriousness.*'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (citations omitted).

The district court did not err in this case in its analysis of whether Maben's alleged comparators were treated differently. Maben identifies four co-workers, Shanna Damouth, Mellany Gardiner, Jodi Hobson, and Lisa Doolen, who she claims were guilty of infractions of "comparable seriousness" to the infractions that led to Maben's dismissal, yet who were not terminated from their positions with Southwestern. Maben first details the poor attendance records of both Damouth and Gardiner and argues that the discipline that those Caucasian employees received was far more lenient than that meted out to her. Although Maben admittedly was counseled repeatedly about her poor attendance, the discharge notice provided to her did not explicitly reference her absenteeism and tardiness as causes for termination. Instead, that document focused upon Maben's inappropriate comments to co-workers and about patients, her inconsistencies in explaining the reason she left work early, and her failure to follow lab protocols that resulted in "putting two patients at risk." Thus, to the extent that Maben seeks to use evidence of Damouth's and Gardiner's attendance records to show that the women were similarly situated, her argument must fail.

Recognizing that reality, Maben also contends that Damouth and Gardiner also were guilty of numerous lab errors but still never received the severe discipline that she did. However, neither alleged comparator was also involved in some of the other serious transgressions with which Maben was charged. Furthermore, Damouth was, in fact, terminated from her position, and Gardiner "was progressing towards termination prior to when she quit" at Southwestern.

Maben next argues that Jodi Hobson received preferential treatment from the defendants despite also being responsible for the lab error that led to the plaintiff's dismissal. Although

Hobson did bear some fault for that lab error, she did not receive harsh discipline for her role because she did not have the lengthy discipline history that Maben did, and because, according to Hurrle, "that whole incident . . . never would have happened had [the plaintiff] done her job correctly."

Similarly, Doolen committed only one serious violation (leaving her computer password exposed where others could view it) while employed at Southwestern. Even so, she received a step-three warning and suspension as a result, and "was on the cusp of being let go."

In short, all of the potential comparators identified by Maben were subjected to various levels of disciplinary action for their transgressions. None of the four, however, engaged in acts that were of comparable seriousness or number to those that precipitated the plaintiff's termination. The district court thus did not err in concluding that Maben failed to adduce sufficient evidence to establish that the defendants' articulated reasons for her termination actually were pretexts to disguise racially discriminatory motives.

### III. CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.